Filed 4/28/14  P. v. Maldonado CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE


THE PEOPLE,

     Plaintiff and Respondent,           A134796

     v.                                       (Alameda County
                                           Super. Ct. No. CH50069)

TAQUAN LAMONT MALDONADO,

     Defendant and Appellant.

_____/


A jury convicted appellant Taquan Lamont Maldonado of the first degree murder of Katrina Moore (Pen. Code, § 187, subd. (a))[1] and found true the allegation he personally used a deadly and dangerous weapon (§ 12202, subd. (b)(1)).  The trial court sentenced appellant to state prison.

On appeal, appellant contends trial counsel rendered ineffective assistance by: (1) presenting a "sudden quarrel/heat of passion" defense without identifying "any actual provocation by the victim" and by failing to argue appellant was provoked over a period of time; (2) misstating the distinction between murder and manslaughter during closing argument; (3) failing to request a pinpoint jury instruction that "adequate provocation

---

[1]    Unless otherwise noted, all further statutory references are to the Penal Code.  By separate order filed this date, we deny appellant's related petition for writ of habeas corpus (A139749) raising ineffective assistance of trial counsel claims.

1

may arise as a result of a series of events over time;" and (4) failing to request a modification to CALCRIM No. 852, which instructs the jury how to consider evidence of uncharged acts of domestic violence. He also claims the prosecutor committed misconduct during closing argument, the court erred by admitting evidence of his prior instances of domestic violence, and cumulative error occurred.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The People charged appellant with murdering Moore on June 5, 2010 (§ 187, subd. (a)) and alleged he used a deadly and dangerous weapon, a knife, in the commission of the offense (§ 12022, subd. (b)(1)).

*Prosecution Evidence*

Moore began dating appellant in 2009. Moore was 10 years younger than appellant and had been previously married. Moore lived in a house on Eden Canyon Road (the house) in Castro Valley with several people, including Stephen Wilson, Japhy Frey, and Lacey Elletson. Appellant did not live at the house, but he frequently spent the night there with Moore. Everyone who lived or spent the night at the house used methamphetamine.

When appellant and Moore began dating, they "got along" and had a "normal" relationship. At some point, however, the relationship changed and they began to argue frequently, sometimes once or twice a day. Wilson, Frey, and Elletson heard appellant and Moore arguing in Moore's bedroom; sometimes Frey heard "stuff crashing . . . loud bangs, doors slamming, that kind of thing." Appellant also called Moore constantly and left her threatening voicemails, sometimes saying, "'I know you're there'" and "'Pick up the phone.'" Some messages were angry, others were "whiny" and "[m]ushy." Appellant also came to the house uninvited, once stealing a car to drive there.

In March 2010, Moore's father saw she had a black eye; Moore said she "got in a fight with" appellant but claimed "it was an accident, it was no big deal . . . really downplaying it." When Moore's father confronted appellant and asked him, "'What did you hit her for?'" appellant looked away and did not respond. When Moore's father

2

encouraged Moore to break up with appellant, she said "they were breaking up, or they were broke[n] up."

In early April 2010, Elletson saw Moore with a black eye. Moore told Elletson she had "gotten into a confrontation[.]" Moore did not want to be seen at work with a black eye, so she stopped going and was fired. Later that month, Elletson heard appellant and Moore fighting in Moore's bedroom. Elletson heard a smack and saw Moore holding her face; Moore told Elletson appellant "put [his] hands on her." In April 2010, Moore complained to Frey that her back hurt: she said appellant "'punched [her] in the back'" and showed Frey a bruise the size of a grapefruit on her back.

In late April or early May 2010, Moore told Frey she was "trying to break up with" appellant but she continued to see him regularly. Elletson thought Moore was confused about whether to continue dating appellant; as Elletson explained, "she was not wanting to be with him but she didn't know how to tell him . . . that she was done [with the relationship], and he wasn't getting the point." Around this same time, Moore spoke with her ex-husband about "getting back together" and moving to Sacramento. Moore and Wilson had intimate relations "a few times" in April or May 2010.

In May 2010 — a few weeks before her death — Moore had a bloody lip after dropping appellant off at his house. She was crying and upset: she told Wilson appellant punched out the back passenger window of her car and "threw her phone at her." The next day, Frey saw appellant with a bandage over a cut on his hand. Appellant admitted he punched the window because he was angry.

Around this time, Moore became pregnant. She told Elletson she felt like she "had this demon in her" and wanted to terminate the pregnancy. On June 1, 2010, Katrina and Elletson went to a clinic to fill out paperwork for Moore to get an abortion. Moore scheduled the abortion for June 3, 2010. Appellant spent the night at Moore's house on June 2, 2010. On the morning of June 3, 2010, the two women drove to Moore's house to pick up appellant. Appellant told Moore he loved her. As the car drove away, Wilson saw appellant throw a knife out the car window and onto the driveway. Wilson picked up the knife — which he thought was from Moore's kitchen — and put it in his bedroom.

3

On Thursday, June 3, 2010, Moore went to the clinic to have an abortion. Elletson accompanied her. On the way to the clinic, they stopped at appellant's house; Elletson waited in the car while Moore "went up to the door" to talk to appellant. Elletson heard appellant and Moore arguing about the abortion: appellant said "he was going to support [Moore] and the baby[.]" Moore returned to the "car crying and jump[ed] in" and appellant "started chasing the car" as Moore drove away. As they drove, appellant called Moore and yelled at her for "murdering his kid[.]" Moore had the abortion that afternoon; appellant called and harassed her that evening.

On June 4, 2010, Moore drove appellant to jail, where he was to serve time for a car theft conviction. Moore told Wilson the jail was "overbooked." She and appellant returned to the house and appellant spent the night. Wilson did not hear appellant and Moore arguing that evening. The next morning, June 5, 2010, Wilson saw appellant and Moore making breakfast. Moore "seemed fine." Wilson went outside to work in the yard. At some point, Wilson heard appellant and Moore arguing inside the house. Wilson heard a loud "thud . . . come from the house[,]" like a body or something heavy hitting the floor. He went to Moore's bedroom, where he heard Moore and appellant talking in "calm voice[s]." Wilson thought appellant was "saying something about you always got to bring up something old" and that he wanted to "start fresh[.]" Wilson went outside and resumed his yard work.

About 15 minutes later, appellant ran outside and said, "'Help me help her.'" Appellant had blood on his elbow. He said Moore fell through a window. Wilson went into the house and saw blood on the archway leading into the living room. Appellant went into Moore's bedroom and shut the door. Wilson did not go into the bedroom; instead, he looked for a phone to call 911. As Wilson looked for a phone, he heard appellant say Moore was "swallowing her tongue, and something about the broken window." Unable to find a working telephone, Wilson went to a neighbor's house to borrow a phone.

Appellant called 911 from a phone in Moore's bedroom and said he needed an ambulance for his girlfriend, who was "stabbed right below her collar bone and her

4

shoulder." When asked, "how did she stab herself" appellant said "Oh my God." He did not respond when asked "who stabbed her or how did she get stabbed?" When asked again who stabbed Moore, appellant said, "We were just playing around [in] the room . . . and then . . . I don't know what happened. We were just playing around. We're just, like, gonna have sex in the room and then she ran into the — into the sliding glass closet." The dispatcher asked appellant, "Y'all were just playing around and she just ran into the knife or something[?]" and appellant said, "No. No knife, the closet."

Law enforcement officers arrived and found Moore on her bedroom floor, covered in blood. She was "wheezing and gurgling" and appellant was "holding a rag to her shoulder." The room was "very disheveled" and there were "blood streaks on the bedroom door, on the walls, carpets" and on appellant's clothes. A mirrored glass closet door in the bedroom was shattered and there were glass fragments on the floor. Moore had a deep, oozing wound near her neck. The officer felt a "very faint" pulse in Moore's neck and prepared to perform CPR. At that point, paramedics arrived and unsuccessfully performed CPR for a lengthy period of time.

A law enforcement officer took appellant out of the bedroom. His clothes were bloody and he had "a laceration on his left forearm" and red marks on his arms, face, chest and back. Appellant "was very excited, hysterical, concerned, distraught" and "kept trying to go back inside" the house. A law enforcement officer moved appellant to a patrol car and arrested him.

Some time later, Moore's ex-husband cleaned Moore's bedroom and found a 9-inch, single blade knife hidden in a floor vent. The knife was usually in a kitchen drawer, about 20 feet from Moore's bedroom. The knife had Moore's blood on it and appellant could not be excluded as the source of a minor DNA profile on the knife. A forensic pathologist testified Moore's wound was consistent with the use of the knife found in her bedroom, not from broken glass. The knife traveled between two ribs, through Moore's left lung, and close to her heart. The pathologist testified people with this type of wound can survive for up to 30 minutes, and opined Moore probably would have survived had

5

she received medical treatment earlier. Moore had methamphetamine in her system when she died.

*Defense Evidence*

Appellant's friends and relatives testified appellant loved Moore and was upset about her decision to have an abortion. Witnesses testified Moore stalked appellant by repeatedly calling him "[a]ll day, all night" and by watching him when he was out in public without her. Witnesses could hear Moore screaming at appellant when she called and testified she sometimes slapped him when she was angry. They also testified appellant frequently tried to pacify Moore. Appellant's ex-wife testified he was not violent during their marital fights, but conceded she applied for a restraining order after he said he had a gun in the garage. She also testified appellant threatened "people" were "going to go down" if she obtained a restraining order.

On cross-examination, appellant's witnesses admitted that when they spoke to appellant while he was in jail, he said the incident was an accident. In one conversation, appellant's aunt advised him to tell the prosecutor Moore got him hooked on methamphetamine, and it "f---ed [his] head up" and "the next thing you know she's dying, and you didn't even know what happened[.]" In response, appellant said, "'Yeah, but I don't know if that s--- will hold in court.'"

*Verdict and Sentence*

A jury convicted appellant of the first degree murder of Moore (§ 187, subd. (a)) and found true the allegation that he used a deadly and dangerous weapon, a knife, in the commission of the offense (§ 12202, subd. (b)(1)). The court sentenced him to 26 years to life in state prison.

## DISCUSSION

Appellant raises several ineffective assistance of trial counsel claims. "When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show

6

resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

I.

*Trial Counsel Was Not Ineffective for Failing to Identify "Provocation by the Victim" During Closing Argument, nor by Failing to Argue Appellant Was Provoked Over a Period of Time*

First, appellant contends trial counsel was ineffective during closing argument for "relying on a voluntary manslaughter/second degree murder heat of passion defense without identifying any provocation" caused by Moore.[2] He also argues trial counsel was

---

[2] "'Homicide is the killing of a human being by another. . . .'" [Citation.] Criminal homicide is divided into two types: murder and manslaughter. 'Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.' [Citation.] Malice aforethought may be express or implied. [Citation.] 'Express malice is an intent to kill. . . . Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses.' [Citation.] A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder. [Citation.] 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.]" [¶] Manslaughter is a lesser included offense of murder. [Citations.] The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, "'at the time of the

7

ineffective for failing to "present the jury with an arguably legally adequate theory of provocation resulting from a series of events over time[.]" According to appellant, it was reasonably probable the jury would have convicted him of second degree murder or voluntary manslaughter had trial counsel presented a "viable theory of provocation."

These claims fail for numerous reasons. First, the record on appeal does not provide trial counsel's reasons for declining to identify specific instances of Moore's provocation, nor trial counsel's reasons for failing to argue provocation based on a series of events. "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.)

Second, trial counsel did identify situations where Moore provoked him. Wilson testified that when appellant and Moore started fighting on June 5, 2010, appellant complained Moore kept "bring[ing] up something old[.]" In addition, trial counsel elicited testimony that Moore was controlling, had a history of fighting with her partners, and had slapped appellant when she was angry. Trial counsel also argued Moore had "a very high level of methamphetamine and amphetamine" in her system when she died, which he argued could explain why she was "agitated and having issues with" appellant.

Third, trial counsel's decision to focus on the day of Moore's death — rather than the weeks and months leading up to that date — was a reasonable tactical choice. (*In re Valdez* (2010) 49 Cal.4th 715, 733 (*Valdez*); *People v. Stanley* (2006) 39 Cal.4th 913, 954

killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 941-942, fn. omitted (*Beltran*).)

(*Stanley*) [reviewing courts defer to "'counsel's reasonable tactical decisions'" and do "'not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight'"].) Presenting a defense that a series of events provoked appellant could have risked focusing the jury's attention on appellant's increasingly possessive and violent behavior, allowing the jury to conclude appellant intended to kill Moore. Appellant concedes as much by noting his "significant pattern of domestic violence . . . increased the likelihood that the jurors would find [he] premeditated and deliberated the killing." In addition, focusing the jury's attention on Moore's decision to terminate her pregnancy could have risked offending certain jurors. (See *People v. Hart* (1999) 20 Cal.4th 546, 631 [risk of "alienating the jury" was a reasonable basis for tactical decision to limit closing argument].)

Moreover, the theory that a series of events provoked appellant was relatively weak in light of testimony supporting a cooling off period, specifically: (1) Wilson's testimony that appellant and Moore did not argue the evening before her death; (2) appellant and Moore made breakfast together on the morning of June 5, 2010; and (3) Moore seemed "fine" that morning. (*Valdez, supra,* 49 Cal.4th at p. 733 [asserting an easily-refuted claim could damage counsel's "credibility before the jury"].) Reasonably competent counsel could have determined it was more advantageous to focus on June 5, 2010 rather than claiming appellant was provoked by a series of events or by Moore.[3]

Finally, appellant's ineffective assistance of counsel claim fails because he cannot establish that but for trial counsel's alleged errors, it is reasonably probable "the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694 (*Strickland*).) The defense conceded appellant stabbed and killed Moore; the

---

[3] This is not, as appellant contends, a situation like *People v. Berry* (1976) 18 Cal.3d 509. In that case, the California Supreme Court concluded the defendant was entitled to a jury instruction on voluntary manslaughter because the defense presented testimony the victim engaged in a "tormenting two weeks" where she "alternately taunted defendant with her involvement with [another man] and at the same time sexually excited defendant, indicating her desire to remain with him." (*Id.* at p. 513.) Here, the court instructed the jury on voluntary manslaughter.

evidence supporting the first degree murder conviction was strong: (1) appellant had a history of physically abusing Katrina; (2) he had to walk at least 20 feet to the kitchen to retrieve the knife and walk another 20 feet back to the bedroom to stab Moore; (3) appellant had a motive to kill Moore because she had an abortion and was going to leave him; and (4) his evasive actions after stabbing Moore appeared calculated and suggested consciousness of guilt consistent with a willful, premeditated murder.  (See *People v. Famalaro* (2011) 52 Cal.4th 1, 36 [jury could infer consciousness of guilt from the defendant's attempts to conceal evidence in first degree murder prosecution].)  In light of the significant evidence supporting the jury's verdict, and, as explained above, the weakness of a defense based on provocation over a period of time or a defense based on provocation by Moore, appellant has not shown a reasonable probability he would have been convicted of second degree murder or voluntary manslaughter had trial counsel presented a different theory of provocation.  (See *People v. Wharton* (1991) 53 Cal.3d 522, 572 [by finding the defendant guilty of first degree murder, the jury rejected a theory he "acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct"].)

## II.

### *Misstating the Distinction Between First Degree Murder and Voluntary Manslaughter Did Not Prejudice Appellant*

Second, appellant argues trial counsel was ineffective for misstating the distinction between murder and manslaughter during closing argument.

During a lengthy closing argument, appellant's trial counsel presented a heat of passion defense in an effort to reduce appellant's crime to second degree murder or voluntary manslaughter.  Trial counsel described the differences between first degree murder, second degree murder, and manslaughter, and recited the jury instruction on manslaughter.  Trial counsel also made the following brief comment: "[N]ow . . . the real difference between murder and manslaughter is did he intend to kill her.  And that if he in fact had an intent to kill her, then why would he not just have let her die?  Why would he call the police if his intent before this happened was to kill her?  That doesn't make any

10

sense." According to appellant, trial counsel's statement was incorrect because "[t]he real difference between murder and manslaughter is whether the defendant acted in response to provocation which would have caused a reasonable person to act rashly from passion, rather than from judgment."

Assuming for the sake of argument trial counsel erred, any error is harmless because appellant cannot demonstrate "a reasonable probability that, but for counsel's [ ] errors, the result of the proceeding would have been different." (*Strickland, supra,* 466 U.S. at p. 694.) First, the mention of intent as a distinguishing factor between murder and manslaughter was an insignificant portion of a 42-page closing argument correctly describing the difference between murder and manslaughter. Trial counsel's use of the word "intent" was not, as appellant argues, "confusing to the jury" because counsel accurately stated the legal standard in other parts of his closing argument and because the jury instructions clarified the proper legal standard. (See *People v. Harrison* (2005) 35 Cal.4th 208, 252.) "Placed in context," trial counsel's statement was "at most a harmless mistake." (*People v. Najera* (2006) 138 Cal.App.4th 212, 222 (*Najera*) [prosecutor's statement equating malice and intent to kill was "at most a harmless mistake"].) Second, appellant cannot establish a reasonable probability of a better result because, as discussed above, substantial evidence supported the first degree murder conviction and the evidence supporting voluntary manslaughter was weak.

III.

*Trial Counsel Did Not Render Ineffective Assistance by Failing to Request a Pinpoint Instruction on Provocation*

Next, appellant contends trial counsel was ineffective for failing to request a pinpoint instruction that "adequate provocation can result from a series of events over time[.]" According to appellant, the jury would have convicted him of voluntary manslaughter absent this error.

At trial counsel's request, the court instructed the jury on second degree murder arising out of provocation (CALCRIM No. 522) and heat of passion voluntary manslaughter (CALCRIM No. 570). The court instructed the jury that "[p]rovocation

11

may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide." The court further instructed the jury that murder can be reduced to manslaughter if: "the defendant was provoked . . . [and] as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;" and the "provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." The court specified "[s]ufficient provocation may occur over a short or long period of time." Trial counsel did not request a pinpoint instruction stating provocation can arise as a result of a series of events over time.

Appellant's ineffective assistance of counsel claim regarding the pinpoint instruction fails because the record on appeal is silent on trial counsel's reasons for declining to request such an instruction. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 (*Mendoza Tello*).) Moreover — and as discussed above — trial counsel's decision to focus on the day of Moore's death was a reasonable tactical choice, particularly where the evidence supporting a defense based on provocation over a series of time was weak. (*People v. Felix* (1994) 23 Cal.App.4th 1385, 1400 ["[e]ven if an instruction had been given, the evidence was just not there to support a defense to the charge. Counsel is not required to make meritless . . . arguments"].) Finally, appellant cannot establish prejudice because the court instructed the jury that "'sufficient provocation may occur over a short or long period of time'" and because substantial evidence supported the first degree murder conviction and the evidence supporting voluntary manslaughter was weak.

IV.

*Appellant Cannot Establish Ineffective Assistance Based on Trial Counsel's*
*Failure to Request a Modification to CALCRIM No. 852*

Fourth, appellant contends trial counsel rendered ineffective assistance by failing to ask the court to modify CALCRIM No. 852 to apply to voluntary manslaughter in addition to murder. According to appellant, a modification to CALCRIM No. 852 would

12

have allowed the jury to conclude he was "'likely' to commit *exactly the crime he contended he did* — voluntary manslaughter." We disagree.

Both parties asked the court to instruct the jury with CALCRIM No. 852, which allows the jury to consider the defendant's prior acts of domestic violence in deciding whether the defendant committed the charged offense. Neither party requested modifications to CALCRIM No. 852, and the trial court gave the instruction, which provides in pertinent part: "The People presented evidence that the defendant committed domestic violence that was not charged in this case. [¶] . . . [¶] If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit murder, as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder. The People must still prove the [elements] of every charge beyond a reasonable doubt."

We conclude appellant's ineffective assistance of counsel claim fails because the record on appeal is silent on trial counsel's reasons for declining to request such an instruction. (*Mendoza Tello, supra,* 15 Cal.4th at p. 266.) Appellant's claim also fails because he cannot show a reasonable probability the outcome of the trial would have been different if the court modified the instruction as he now proposes. The modification to CALCRIM No. 852 would not have affected the significant amount of evidence supporting the first degree murder conviction.[4] Additionally and perhaps most

---

**4** That CALCRIM No. 852 could have been modified to refer to voluntary manslaughter does not establish ineffective assistance based on trial counsel's failure to request such a modification. Appellant's reliance on *People v. Dallas* (2008) 165 Cal.App.4th 940 (*Dallas*) does not alter our conclusion. In that case, the prosecution charged the defendant with felony infliction of injury on a child and felony child abuse and the trial court admitted prior acts of child abuse under Evidence Code section 1109 in connection with both charges. The *Dallas* court rejected the defendant's argument that

importantly, the prior domestic violence evidence did not tend to show appellant acted in the heat of passion. To the contrary and as appellant concedes, the "significant pattern of domestic violence . . . increased the likelihood" the jury would find he premeditated and deliberated before killing Moore.

V.

*Appellant's Prosecutorial Misconduct Claim Fails*

Next, appellant claims the prosecutor committed prejudicial misconduct by "misstating the law of heat of passion voluntary manslaughter" during closing argument.

In rebuttal argument, the prosecutor focused on why appellant's crime was murder, not manslaughter. She read the voluntary manslaughter jury instruction: "manslaughter is a killing that would otherwise be murder. It's reduced to voluntary manslaughter if a defendant kills someone because of a sudden quarrel or in the heat of passion[.]" The prosecutor also explained the requirements of a heat of passion defense: "One, the defendant was provoked; two, as a result of the provocation the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; three, the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is from passion rather than from judgment. . . . It is not enough that the defendant was simply provoked. The defendant is not allowed to set up his own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and

_____

the trial court erred by allowing the jury to consider the prior acts of child abuse in connection with felony child abuse charge. (*Dallas, supra*, 165 Cal.App.4th at p. 957.) The court held Evidence Code section 1109 evidence is admissible in "'a criminal *action*[,]'" which "embraces all of the counts (and other allegations) charged. If the Legislature had wanted to make the evidence admissible only in connection with a particular count, it could have said so." (*Dallas, supra,* 165 Cal.App.4th at p. 958.) *Dallas* does not assist appellant. First, it is factually distinguishable because it does not concern CALCRIM No. 852. Second, the *Dallas* court articulated a rule that Evidence Code section 1109 evidence is admissible in connection with all charges and allegations in a criminal action. Appellant has not shown that instructing on Evidence Code section 1109's application to the charged offenses, and omitting its application to lesser included offenses, prejudiced him.

14

knowing the same facts would have reacted from passion rather than judgment." The prosecutor asked the jury to consider whether "the victim's actions equal provocation that would cause an ordinary person to act rashly in response[.] It's the victim's actions."

The prosecutor provided two examples of heat of passion provocation and stated, "[r]emember, it's not did the defendant act rashly and under the sudden quarrel and heat of passion. The standard is would an ordinary, reasonable person in the defendant's situation have done what he did." The prosecutor argued appellant's crime was not manslaughter because his behavior "was not the conduct of a reasonable person of average disposition. [His] behavior was the behavior of a desperate and scorned man. So are we to say that because Katrina was trying to break up with him, because they were in an argument, therefore, what he did should be reduced, the fact that he stabbed her should be reduced from murder to manslaughter? His actions are not what a reasonable, ordinary person would do." In addition, the prosecutor stated, "They're arguing and he stabs her. And is that enough? Is that what a reasonable person would do? Don't let him, because of what he did, reduce murder to manslaughter. His behavior is not the conduct of an average reasonable person." The prosecutor told the jury "would an average person react the way that he did because someone's trying to break up with them? No. It's not in the heat of passion." Finally, the prosecutor argued the killing was "not in the heat of passion" because there was no "real adequate provocation" and because of the "cooling period" between the abortion and the stabbing.

Appellant contends the prosecutor misstated the law during closing argument by encouraging the jury to consider the reasonableness of his conduct in reacting to provocation rather than considering whether the provocation was sufficient to cause a reasonable person to react from passion, not judgment. Our high court has held "provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Beltran, supra,* 56 Cal.4th at p. 949.)

A prosecutor commits misconduct by mistaking the law during argument. (*People v. Marshall* (1996) 13 Cal.4th 799, 831; *People v. Otero* (2012) 210 Cal.App.4th 865,

15

870.) The People concede the prosecutor "committed misconduct" by focusing on whether a "'reasonable person of average disposition' would have killed under the circumstances." When a prosecutorial misconduct claim is based on the prosecutor's arguments to the jury, we consider the challenged statements in the context of the argument as a whole, and determine whether it is reasonably likely the jury construed or applied any of the challenged statements in an objectionable fashion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1202-1203.) Appellant has forfeited his prosecutorial misconduct claim fails because trial counsel did not request an admonishment or object to any of the challenged remarks. "'[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' [Citation.]" (*Stanley*, *supra,* 39 Cal.4th at p. 952.)

In the alternative, appellant claims trial counsel's failure to object to the alleged prosecutorial misconduct constituted ineffective assistance. We disagree. Even if trial counsel had no valid tactical reason for failing to object to the prosecutor's misstatement of the law, appellant cannot demonstrate a reasonable probability the outcome of his trial would have been different absent that error. "The standard for prejudice is a reasonable probability that, but for counsel's error, the verdict would have been different. [Citations.]" (*People v. Neely* (2009) 176 Cal.App.4th 787, 796; *Strickland, supra,* 466 U.S. at pp. 691-694.) Here, the court's instructions to the jury rendered harmless any prosecutorial misconduct. The court instructed the jury with revised CALCRIM No. 570, which provided, in clear and unambiguous terms, the objective requirement that the provocation must be sufficient to arouse the passions of a reasonable person, and contained no reference to how a reasonable person would react under the same circumstances. (*Beltran, supra,* 56 Cal.4th at p. 954.) In addition, the court instructed the jury that "[n]othing that the attorneys say is evidence" and that "[y]ou must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

16

"[W]e presume that the jury relied on the instructions, not the arguments, in convicting [appellant]." (*People v. Morales* (2001) 25 Cal.4th 34, 47; see also *People v. Boyette* (2002) 29 Cal.4th 381, 436 [presuming the jury followed the court's instructions on the law, including the instruction that "to the extent the law as given by the trial court conflicted with the description of the law as given by the attorneys, the jury was to follow the court's instructions"].) We are not persuaded by appellant's claim that the timing of the prosecutor's statements unduly swayed or confused the jury. (Cf. *Najera, supra,* 138 Cal.App.4th at p. 224 [prosecutor's misstatements not prejudicial despite jury confusion regarding reasonableness of the defendant's conduct where the "court correctly instructed the jury to follow [its] instructions, not the attorneys' description of the law"]; *Beltran, supra* 56 Cal.4th at p. 956 [prosecutor's misstatements of law did not prejudice the defendant where the court's clarifying instruction "properly refocused the jury on the relevant mental state, properly set out in CALCRIM No. 570, and away from whether an ordinary person of average disposition would kill in light of the provocation"].)

Moreover — and as discussed above — the first degree murder verdict was well supported by evidence and the evidence supporting a voluntary manslaughter verdict was weak. (*Najera, supra,* 138 Cal.App.4th at p. 224 [failure to object was harmless error where facts did not support a manslaughter defense].) We are not persuaded by appellant's claim that the prosecutor's incorrect statement of the law lessened the prosecution's burden of proof. (*Beltran, supra,* 56 Cal.4th at p. 956 [applying *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*)].) Finally, we reject as unsupported by authority appellant's passing comment suggesting the court should have given an "instruction or admonition clarifying the reasonableness requisite to heat of passion voluntary manslaughter."

## VI.

### *Any Error in Admitting Prior Incidents of Domestic Violence Was Harmless*

Appellant argues the court erred by admitting evidence of five prior instances of domestic violence against Moore because her statements describing the incidents were inadmissible hearsay.

A.   The Prosecutor's Motion to Admit Prior Acts of Domestic Violence

The prosecutor moved in limine to admit evidence of several prior acts of domestic violence by appellant against Moore pursuant to Evidence Code sections 1101, subdivision (b) and 1109.  Following a hearing, the court admitted the following incidents pursuant to Evidence Code section 1109 and witnesses testified to these statements at trial.

Incident No. 1: a late February or early March 2010 incident where Moore's father saw her with a swollen lip.  When Moore's father asked her about the injury, Moore said appellant had accidentally bumped her.  Moore's father confronted appellant, saying, "You hit her.  Don't ever hit my daughter.  You touch her again, you've gotta deal with me."  Appellant did not deny the claims or argue with Moore's father.  The prosecutor argued appellant's response to Moore's father's accusations was relevant and was an adoptive admission.  Appellant objected to this evidence, arguing Moore's father was "speculating" on what happened, and that the evidence lacked foundation, and was irrelevant and inflammatory under Evidence Code section 352.  The court concluded appellant's failure to "deny anything" was an adoptive admission.

Incident No. 5: an April 2010 incident where Moore told Wilson appellant threw a coffee cup at a sliding glass door during an argument, breaking the glass.  The court initially excluded the evidence but later allowed Wilson to testify appellant "threw a coffee cup" over defense counsel's hearsay objection.

Incident No. 6: an April 2010 incident when Moore told Elletson she and appellant had "'gotten into it,'" and appellant gave Moore a black eye.  One of Moore's co-workers noticed the black eye.  Moore told Elletson she was embarrassed by the black eye, and had not gone to work because of it.  Moore's co-worker noticed a black eye around the same time.  Moore was fired for not going to work.  The court noted the evidence was "physical abuse . . . statements from the victim, closeness in time" and in response, trial counsel "[s]ubmitted."  The court then admitted the evidence.

Incident No. 8: a May 2010 incident, when Elletson heard appellant and Moore arguing in her bedroom.  After hearing a smack, Elletson ran into the bedroom and saw

18

Moore holding her cheek. When she asked appellant, "'Did you put hands on her[,]'" appellant denied hitting Moore, but Moore told Elletson appellant had slapped her. The court noted, "that seems [to be a] pretty clear case of domestic violence and a domestic violence act that has corroboration. . . . And then subsequently the victim does confirm and the defendant makes a denial and takes off." Appellant's counsel "object[ed] and submit[ted]."

Incident No. 10: a late April 2010 incident where Frey and Moore were in Moore's room and Moore complained that "[her] back hurt" and Frey asked her why it hurt. Moore told him appellant punched her in the back and showed Frey a bruise the size of two baseballs. Defense counsel argued, "I don't think it's corroborated; it's hearsay of the witness, who is obviously a very biased witness in this case." The court concluded the evidence was admissible under Evidence Code section 1109 and was not inadmissible under Evidence Code section 352, noting it would not confuse the issues and was "clearly not as inflammatory as being stabbed to death."

B.    The Admission of Incident Nos. 1, 5, 6, 8, and 10 was Harmless Error

"Evidence Code section 1109 allows the introduction of evidence of defendant's commission of prior acts of domestic violence in a criminal action charging defendant with an offense involving domestic violence." (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138.) Subject to certain exceptions not applicable here, Evidence Code section 1109 provides "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." (Evid. Code, § 1109, subd. (a)(1).)

Appellant claims the court erred by admitting "hearsay evidence of multiple instances of alleged prior domestic violence and other prior bad acts" committed by him.[5]

---

[5]    Appellant cannot seriously contend the domestic violence evidence was inadmissible under Evidence Code section 1109, and numerous California courts have rejected his claim that the admission of this evidence violated his federal due process

19

In response, the People contend appellant forfeited this claim with respect to Incidents Nos. 1, 6, and 8 by not objecting on hearsay grounds at trial. They also contend the evidence was admissible pursuant to the hearsay exceptions set forth in Evidence Code sections 1240 and 1250 and that any error in admitting the evidence was harmless. Appellant contends a hearsay objection would have been futile and, alternatively, that trial counsel was ineffective for failing to object on hearsay grounds.

We assume for the sake of argument the court erred by admitting the challenged evidence. We conclude any error is harmless because appellant would have been convicted of first degree murder had the court excluded Incident Nos. 1, 5, 6, 8, and 10. (*Watson, supra,* 46 Cal.2d at p. 836.) As previously discussed, there was ample evidence from which the jury could determine appellant killed Moore with premeditation and deliberation including evidence that appellant: (1) had a motive to kill Moore; (2) walked to and from the kitchen to retrieve the murder weapon; (3) hid the murder weapon and fabricated a story about how Moore was stabbed; and (4) left Moore threatening voicemails.

We are not persuaded by appellant's claim that "[i]n the absence of the erroneous admission" of the evidence "there is a reasonable probability that one or more jurors would have entertained a reasonable doubt as to whether the offense was second degree murder or voluntary manslaughter." As appellant concedes, even if the court had excluded Moore's descriptions of the prior domestic violence, the jury would still have heard "direct evidence of prior domestic violence[,]" including evidence that appellant threw a cell phone at Moore, split open her lip, broke her car window with his hand because he was "mad," and gave Moore a black eye. It is not reasonably probable the jury would have returned a more favorable verdict had the court excluded the above testimony. (*Watson, supra,* 46 Cal.2d at p. 836.)

---

rights. (See *People v. Johnson* (2010) 185 Cal.App.4th 520, 529 ["section 1109 does not offend due process" and citing cases].)

## VII.

### *Cumulative Error*

Appellant's final contention is the cumulative impact of the above errors deprived him of a fair trial.  We have either rejected appellant's claims of error and/or found that any errors, assumed or not, were not prejudicial.  "Viewed as a whole, such errors do not warrant reversal of the judgment."  (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

### DISPOSITION

The judgment is affirmed.

_____

Jones, P.J.

We concur:

_____

Simons, J.

_____

Needham, J.